1  GREGORY M. DOYLE (SBN 092155)
   THOMAS M. CROWELL (SBN 172799)
2  TOSCHI, SIDRAN, COLLINS & DOYLE
   100 Webster Street, Suite 300
3  Oakland, CA  94607
   Tel:  (510) 835-3400
4  Fax: (510) 835-7800

5  Attorneys for Defendant,
   NEW MOON GIRL MEDIA, INC.
6

7

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11  SUZANNE D. JACKSON,                  )  Case No.: 3: 11-cv-02753-JSW
                                         )
12              Plaintiff,               )
                                         )
13  v.                                   )  **DECLARATION OF NANCY GRUVER**
                                         )  **IN SUPPORT OF DEFENDANT NEW**
14  WILLIAM FISCHER, JON SABES,          )  **MOON GIRL MEDIA, INC.'S MOTION**
    STEVEN SABES, MARVIN SIEGEL.         )  **TO DISMISS PLAINTIFF'S SECOND**
15  BRIAN CAMPION. LONNIE                )  **AMENDED COMPLAINT**
    BOOKBINDER, MANI KOOLASURIYA.        )
16  JORGE FERNANDES, JOSHUA ROSEN,       )  DATE:     October 31, 2012
    STEVE WATERHOUSE, JEAN PAUL a/k/a    )  TIME:     9:00 a.m.
17  "BUZZY" LAMERE, UPPER ORBIT, LLC.,   )  DEPT:     3
    SPECIGEN, INC., PEER DREAMS, INC.,   )  JUDGE:  Hon. Phyllis J. Hamilton
18  NOTEBOOKZ INC., ILEONARDO.COM        )
    INC., NEW MOON LLC; MONVIA LLC,      )  Complaint Filed: June 6, 2011
19  CH LIMITED AND SAZANI BEACH          )
    HOTEL.                               )  Trial Date:  None
20            Defendants.                /

21  I, Nancy Gruver, declare:

22  1.  I am a resident of Alameda County, CA, and am the founder and Chief Executive Officer of

23      New Moon Girl Media, Inc. ("New Moon"), a defendant in the above-captioned matter. I have

24      personal knowledge of each fact in this declaration, unless stated otherwise, in which case the

25      fact is based on the best information available to me after conducting a reasonable inquiry on

26      the subject, and, if called as a witness, could and would testify competently to such facts under

27      oath.

28

-1-

3: 11-cv-02753-JSW: DECLARATION OF NANCY GRUVER IN SUPPORT OF DEFENDANT NEW MOON GIRL
MEDIA, INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

2. Attached hereto as Exhibit "A" is a true and correct copy of a contract which New Moon entered into with defendant Upper Orbit, LLC ("Upper Orbit").

3. Attached hereto as Exhibit "B" is a true and correct copy of the document entitled "Business Plan" that I provided to defendant William Fisher prior to Upper Orbit's disbursement of funds to New Moon.

4. I have never met Suzanne Jackson and have never communicated with her.

5. To the best of my knowledge, no other employee at new Moon has even heard of Ms. Jackson, and none has communicated with Ms. Jackson.

6. I have never offered to sell securities to Ms. Jackson nor have I ever solicited Ms. Jackson to invest in New Moon.

7. To the best of my knowledge, no employee of New Moon has ever offered to sell securities to Ms. Jackson or solicited Ms. Jackson to invest in New Moon.

8. Defendant William Fisher has never mentioned Ms. Jackson to me in the context of Ms. Jackson making a personal investment in New Moon.

9. Mr. Fischer made it clear to me that any potential investment in New Moon would be made through Upper Orbit, a limited liability company that he owned and controlled.

10. After I provided Mr. Fischer with New Moon's business plan, he asked a series of questions about New Moon's business model and other aspects of the business.

11. The stock purchase agreement issued to Upper Orbit contains no mention of Ms. Jackson and specifically lists Upper Orbit as the "investor."

//

//

//

//

//

//

//

-2-

3: 11-cv-02753-JSW: DECLARATION OF NANCY GRUVER IN SUPPORT OF DEFENDANT NEW MOON GIRL MEDIA, INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

12. Ms. Jackson does not own any New Moon securities; Upper Orbit is the owner and investor of the securities which Plaintiff describes in her complaint. The first knowledge I had of Ms. Jackson's possible involvement with Upper Orbit was when I was contacted by her attorney prior to this lawsuit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on August 6, 2012 at Emeryville, California.

DATED: August 6, 2012

By: _____
Nancy Gruver

# EXHIBIT "A"

NEW MOON GIRL MEDIA, INC.

SERIES A PREFERRED STOCK PURCHASE AGREEMENT

Initial Closing:  July 2, 2008

# NEW MOON GIRL MEDIA, INC.

## SERIES A PREFERRED STOCK PURCHASE AGREEMENT

This Series A Preferred Stock Purchase Agreement (this "**Agreement**") is made as of July 2, 2008, by and among New Moon Girl Media, Inc., a Delaware corporation (the "**Company**"), and individuals and entities sent forth on the Schedule of Investors (the "**Schedule of Investors**") attached hereto as <u>Exhibit A</u> (each, an "**Investor**" and collectively, the "**Investors**").

1.

Authorization, Sale and Issuance.

(a) Authorization.    The Company will, prior to the Initial Closing (as defined below) authorize: (a) the sale and issuance of up to 1,968,750 shares (the "**Shares**") of the Company's Series A Preferred Stock, par value $0.001 per share (the "**Preferred Stock**"), and (b) the reservation of shares of the Company's Common Stock, par value $0.0001 per share (the "**Common Stock**"), for issuance upon conversion of the Shares (the "**Conversion Shares**").

(b) Sale and Issuance of Shares.    Subject to the terms and conditions of this Agreement, each Investor agrees to purchase, and the Company agrees to sell and issue to such Investor, the number of Shares set forth in the column designated "Number of Preferred Shares" opposite such Investor's name on the Schedule of Investors, attached hereto as <u>Exhibit A</u>, at a cash purchase price of $0.40 per share, provided that each Investor which purchases, and to which the Company sells and issues, Shares at the Initial Closing shall be permitted to purchase such Shares at a cash purchase price of $0.32 per share (in each case, such purchase price shall be referred to as the "**Purchase Price**").

2.

Closing Dates and Delivery.

(a) Initial Closing.    The purchase, sale and issuance of the Shares shall take place at one or more closings (each of which is referred to in this Agreement as a "**Closing**").    The initial Closing (the "**Initial Closing**") shall take place at the offices of Wilson Sonsini Goodrich & Rosati, Professional Corporation 650 Page Mill Road, Palo Alto, California 94304, at 10:00 a.m. local time on June __, 2008, or such other date as the Company and the Investors may agree.

(b)      Additional Closings.    At any time and from time to time from the date of this Agreement until September __, 2008, the Company may, at one or more subsequent closings (each, a "**Subsequent Closing**"), without obtaining the signature, consent or permission of any of the Investors, offer and sell to other investors (the "**New Investors**") up to that number of Shares that is equal to the total number of Shares authorized for sale hereunder less the number of Shares sold at the Closings prior to the date of such Subsequent Closing. Any such sale shall be on the same terms and conditions as those contained herein.    Any such sale and issuance in a Subsequent Closing shall

be on the same terms and conditions as those contained herein, and such persons or entities shall, upon execution and delivery of the relevant signature pages, become parties to, and be bound by, this Agreement, and the Stockholders' Agreement in substantially the form of <u>Exhibit B</u> attached hereto (the "**Stockholders' Agreement,**" and together with this Agreement, the "**Agreements**"), without the need for an amendment to any of the Agreements except to add such person's or entity's name to the appropriate exhibit to such Agreements, and shall have the rights and obligations hereunder and thereunder, in each case as of the date of the applicable Subsequent Closing. Each Subsequent Closing shall take place at such date, time and place as shall be approved by the Company in its sole discretion.

(c)     Delivery.  At each Closing, the Company will deliver to each Investor in the Closing a certificate registered in such Investor's name representing the number of Shares that such Investor is purchasing in the Closing against payment of the purchase price therefor as set forth in the column designated "Purchase Price" opposite such Investor's name on the Schedule of Investors, by (i) check payable to the Company, (ii) wire transfer in accordance with the Company's instructions, (iii)     provision     of     services     or     (iv) any     combination     of     the     foregoing.

Representations and Warranties of the Company.

The Company hereby represents and warrants to the Investors as follows:

(a) Organization, Good Standing and Qualification.  The Company is a company duly incorporated, validly existing and in good standing under the laws of the State of Delaware.  The Company has the requisite corporate power and authority to own and operate its properties and assets, to carry on its business as presently conducted, to execute and deliver the Agreements, to issue and sell the Shares and the Conversion Shares and to perform its obligations pursuant to the Agreements.  The Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified would reasonably be expected to have a material adverse effect on the Company's financial condition or business as now conducted or as currently proposed to be conducted (a "**Material Adverse Effect**").  The Company's Amended and Restated Certificate of Incorporation as currently in effect is attached hereto as <u>Exhibit C</u> (the "**Charter**").

(b)    Subsidiaries.  The Company does not have any direct or indirect ownership interest in any corporation, partnership, joint venture, association or other business enterprise.

(c)    Capitalization  Immediately prior to the Initial Closing, the authorized capital stock of the Company will consist of 30,000,000 shares of Common Stock, of which 9,200,000 shares are issued and outstanding, and 1,968,750 shares of Preferred Stock, all of which are designated Series A Preferred and none of which are issued and outstanding.  Except for the 800,000 shares of Common Stock reserved for issuance under the Company's 2008 Stock Plan, there are no outstanding options, warrants, rights (including conversion or preemptive rights) or agreements for the purchase or acquisition from the Company of any shares of its capital stock or any securities convertible into or ultimately exchangeable or exercisable for any shares of the Company's capital stock.

(d)    Authorization.  All corporate action on the part of the Company and its directors, officers and stockholders necessary for the authorization, execution and delivery of the Agreements by the Company, the authorization, sale, issuance and delivery of the Shares and the Conversion Shares, and the performance of all of the Company's obligations under the Agreements has been taken or will be taken prior to the Closing.  The Shares, when issued pursuant to the terms and conditions of this Agreement, and upon the receipt of full payment of the Purchase Price, shall be duly authorized, fully-paid and non-assessable.  The Conversion Shares have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Charter and applicable law, will be validly issued, fully paid and nonassessable.  The Agreements, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity.

(e) Litigation.  Except as set forth on the Disclosure Schedule attached hereto as <u>Exhibit D</u>, there are no actions, suits or proceedings pending against the Company or its properties (nor has the Company received written notice of any threat thereof) before any court or governmental agency. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

(f)    Intellectual Property.  To the knowledge of the Company (without having conducted any special investigation or patent search), the Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and similar proprietary rights necessary to the business of the Company as currently conducted and as currently proposed to be conducted, the lack of which could reasonably be expected to have a Material Adverse Effect, except for such items as have yet to be conceived or developed.

(g) Compliance with Law and Documents.  The Company is not in violation or default of any provisions of the Charter or its Bylaws, both as amended to date, and to the Company's knowledge, the Company is in compliance with all applicable statutes, laws, regulations and executive orders of the United States of America and all states, foreign countries or other governmental bodies and

-3-

agencies having jurisdiction over the Company's business or properties where such violation would have a Material Adverse Effect. The execution, delivery and performance of this Agreement will not result in any such violation or default, or be in conflict with or result in a violation or breach of, with or without the passage of time or the giving of notice or both, (i) the Charter or Bylaws of the Company, (ii) any agreement or contract of the Company, or, (iii) to the Company's knowledge, a violation of any statute, law, regulation or order, or an event which results in the creation of any lien, charge or encumbrance upon any asset of the Company, which, in each case would reasonably be expected to have a Material Adverse Effect.

(h) Financial Statements. The Company has no material liability or obligation, absolute or contingent (individually or in the aggregate) except obligations and liabilities incurred in the ordinary course of business that do not, individually or in the aggregate, have a Material Adverse Effect.

(i) Governmental Consent. No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares, or the consummation of any other transaction contemplated by this Agreement, except (i) the filing of such notices as may be required under the Securities Act of 1933, as amended (the "**Securities Act**") and (ii) such filings as may be required under applicable state securities laws.

(j) Permits. The Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which would have a Material Adverse Effect, and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as presently planned to be conducted. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

(k) Offering. Subject to the accuracy of the Investors' representations and warranties in Section 4, the offer, sale and issuance of the Shares to be issued in conformity with the terms of this Agreement (i) constitute transactions exempt from the registration requirements of Section 5 of the Securities Act and (ii) are exempt from the registration requirements of any applicable state and federal securities laws and neither the Company nor any authorized agent action on its behalf will take any action hereafter that would cause the loss of such exemption.

(l) Brokers or Finders. Except as set forth on the Disclosure Schedule attached hereto as Exhibit D, the Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby.

(m)Tax Returns and Audits. The Company has accurately prepared and timely filed all federal, state and other tax returns required by law to be filed, has paid or made provision for the payment of all taxes shown thereon to be due, including, without limitation, taxes related to employment, and all additional assessments where any nonpayment would result in a Material

Adverse Effect. None of the federal income tax returns of the Company has been audited by the Internal Revenue Service in such a manner as to bring such audit to the attention of the Company.

(n) Disclosure. The Company has provided each Investor with all the information regarding the Company reasonably available to it without undue expense that such Investor has requested for deciding whether to purchase the Shares. To the Company's knowledge, the Agreements and the information which has been provided to the Investor by the Company, when taken as a whole, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. The Company does not represent or warrant that it will achieve any financial projections provided to the Investors and represents only that such projections were prepared in good faith.

4.

Representations and Warranties of the Investors.

Each Investor, severally and not jointly, hereby represents and warrants to the Company as follows:

(a) No Registration. Such Investor understands that neither the Shares nor the Conversion Shares (together, the "**Securities**") have been, and nor will they be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Investor's representations as expressed herein or otherwise made pursuant hereto.

(b) Investment Intent. Such Investor is acquiring the Securities for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and that the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Such Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to any of the Securities.

(c) Investment Experience. Such Investor has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company and acknowledges that the Investor can protect its own interests. Such Investor has such knowledge and experience in financial and business matters so that the Investor is capable of evaluating the merits and risks of its investment in the Company.

(d) Speculative Nature of Investment. Such Investor understands and acknowledges that the Company has a limited financial and operating history and that an investment in the Company is highly speculative and involves substantial risks. Such Investor can bear the economic risk of the Investor's investment and is able, without impairing the Investor's financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of the Investor's investment.

(e) Access to Data.  Such Investor has had an opportunity to ask questions of, and receive answers from, the officers of the Company concerning the Agreements, the exhibits and schedules attached hereto and thereto and the transactions contemplated by the Agreements, as well as the Company's business, management and financial affairs, which questions were answered to its satisfaction.  Such Investor believes that it has received all the information the Investor considers necessary or appropriate for deciding whether to purchase the Shares.  Such Investor acknowledges that any business plans were prepared by the Company in good faith and have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.  Such Investor also acknowledges that it is relying solely on its own counsel and not on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by the Agreements.  Nothing in this paragraph shall be construed to limit such Investor's rights and ability to rely on the Company's representations and warranties in Article 3 of this Agreement.

(f) Accredited Investor.  Such Investor is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company.

(g) Residency.  The residency of such Investor (or, in the case of a partnership, limited liability company or corporation, such entity's principal place of business) is correctly set forth on the Schedule of Investors.

(h) Rule 144.  Such Investor acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available.  The Investor is aware of the provisions of Rule 144 promulgated under the Securities Act which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, compliance with the relevant holding periods, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares being sold during any three-month period not exceeding specified limitations.  Such Investor understands that the current public information referred to above is not now available and the Company has no present plans to make such information available.  Such Investor acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell the Securities, and that, in such event, the Investor may be precluded from selling such Securities under Rule 144, even if the other requirements of Rule 144 have been satisfied.  Such Investor acknowledges that, in the event all of the requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities.  Such Investor understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such

offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

(i) No Public Market.   Such Investor understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

(j) Authorization.

(i)      Such Investor has all requisite power and authority to execute and deliver the Agreements, to purchase the Shares hereunder and to carry out and perform its obligations under the terms of the Agreements.  All action on the part of such Investor necessary for the authorization, execution, delivery and performance of the Agreements, and the performance of all of such Investor's obligations under the Agreements, has been taken or will be taken prior to the Closing.

(ii)      The Agreements, when executed and delivered by such Investor, will constitute valid and legally binding obligations of such Investor, enforceable in accordance with their terms except: (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies or by general principles of equity.

(iii)      No consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by such Investor in connection with the execution and delivery of the Agreements by such Investor or the performance of such Investor's obligations hereunder or thereunder.

(k) Brokers or Finders.   Such Investor has not engaged any brokers, finders or agents, and neither the Company nor any other Investor has, nor will, incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Agreements.

(l) Tax Advisors.   Such Investor has reviewed with its own tax advisors the U.S. federal, state, local and foreign tax consequences of this investment and the transactions contemplated by the Agreements.  With respect to such matters, such Investor relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral.  Such Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Agreements.

(m)Legends.   Such Investor understands and agrees that the certificates evidencing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or the Conversion Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by the Stockholders' Agreement or under applicable state securities laws):

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS

AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS."

5.

Conditions to Investors' Obligations to Close.

Each Investor's obligation to purchase the Shares at each Closing is subject to the fulfillment on or before such Closing of each of the following conditions, unless waived by the applicable Investor purchasing the Shares in such Closing:

(a) Representations and Warranties.   The representations and warranties made by the Company in **Section 3** shall be true and correct as of the date of the Closing.

(b) Covenants.  All covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the Closing shall have been performed or complied with in all material respects.

(c) Qualifications.  All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

(d) Stockholders Agreement.The Company, the Founders and the Investors (each as defined in the Stockholders' Agreement) shall have executed and delivered the Stockholders' Agreement.Charter.  The Charter shall be filed with the Delaware Secretary of State and in full force and effect.

6.

Conditions of Company's Obligation to Close.

The Company's obligation to sell and issue the Shares at each Closing is subject to the fulfillment on or before such Closing of the following conditions, unless waived by the Company:

(a) Representations and Warranties.   The representations and warranties made by the Investors in **Section 4** shall be true and correct as of the date of the Closing.

(b) Covenants.  All covenants, agreements and conditions contained in this Agreement to be performed by the Investors on or prior to the date of the Closing shall have been performed or complied with in all material respects as of the date of the Closing.

(c) Compliance with Securities Laws.  The Company shall be satisfied that the offer and sale of the Shares shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

(d)   Stockholders Agreement.The Founders and the Investors (each as defined in the Stockholders' Agreement) shall have executed and delivered the Stockholders' Agreement.Charter. The Charter shall be filed with the Delaware Secretary of State and in full force and effect.

7.

Miscellaneous.

(a) Amendment and Waivers.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the holders of a majority of the then-outstanding Shares.

(b) Notices.  All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or otherwise delivered by hand or by messenger addressed:

(i)   if to an Investor, at the Investor's address or facsimile number as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(ii)   if to the Company, at such address or facsimile number as the Company shall have furnished to the Investors, with a copy to Aaron J. Alter, Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid or, if sent by facsimile, upon confirmation of facsimile transfer or, if sent by electronic mail, upon confirmation of delivery when directed to the electronic mail address set forth on the Schedule of Investors.

(c) Governing Law.  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California or of any other state.

(d) Expenses.  The Company and the Investors shall each pay their own expenses in connection with the transactions contemplated by this Agreement.  Notwithstanding the foregoing, the Company shall reimburse Sofia Fund for the reasonable legal expenses incurred by it in connection with the transactions contemplated by this Agreement, provided that such reimbursement shall not exceed $5,000.

(e) Successors and Assigns.  This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company.  Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void.  Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

(f) Entire Agreement.  This Agreement including the exhibits attached hereto, the Stockholders' Agreement and the Charter, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and thereof.  No party shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein or therein.

(g) Delays or Omissions.  Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

(h) California Corporate Securities Law.  THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.  THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

(i) Severability.  If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and

-10-

enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

(j) Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(k) Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

(l) Telecopy Execution and Delivery. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

(m) Further Assurances. Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

*(The remainder of this page is left intentionally blank.)*

FROM :New Moon Publishing          FAX NO. :2187280314          Jun. 30 2008 05:54PM  P4

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

**COMPANY**

**NEW MOON GIRL MEDIA, INC.,**
a Delaware Corporation

By: _____

Name: Nancy Gruver

Title: CEO

**\*\*\*New Moon Girl Media, Inc. – Series A Preferred Stock Purchase Agreement\*\*\***

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

**INVESTOR**

**UPPER ORBIT, LLC**

By: _William Fischer_

Name: _WILLIAM Fischer_

Title: _President 7/1/08_

***New Moon Girl Media, Inc. – Series A Preferred Stock Purchase Agreement***

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

**INVESTOR**

**MONVIA, LLC**

By: _____

Name:  MAWI  KULASOORIYA

Title:  MANAGING  PARTNER

***New Moon Girl Media, Inc. – Series A Preferred Stock Purchase Agreement***

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

**INVESTOR**

BRUCE J. DERAUF

JUDITH H. DERAUF

**\*\*\*New Moon Girl Media, Inc. – Series A Preferred Stock Purchase Agreement\*\*\***

FROM :New Moon Publishing          FAX NO. :2187280314          Jul. 02 2008 02:00PM  P7

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

**INVESTOR**

**SOFIA FUND**

By: _____

Name: _Catherine A. Connett_

Title: _Chair_____

**\*\*\*New Moon Girl Media, Inc. – Series A Preferred Stock Purchase Agreement\*\*\***

## EXHIBIT A

### SCHEDULE OF INVESTORS

**Initial Closing:  July 2, 2008**
**Price per Share:  $0.32**

| Investor | Number of Preferred Shares | Purchase Price |
|---|---|---|
| Upper Orbit, LLC | 937,500 | $300,000 |
| Monvia, LLC | 562,500 | $180,000 (1) |
| Bruce J. Derauf & Judith H. Derauf | 156,250 | $50,000 |
| Sofia Fund | 312,500 | $100,000 |
| **TOTAL** | **1,968,750** | **$630,000** |

(1) The form of consideration is provision of services to the Company.

## EXHIBIT B

## STOCKHOLDERS' AGREEMENT

## EXHIBIT C

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

## **EXHIBIT D**

### **DISCLOSURE SCHEDULE**

**Section 3(d):**  The Company received an email on April 18, 2008 from a vendor, Nita B Creative, threatening legal action as of May 1, 2008.  The Company responded to the email on April 20, 2008 and has received no further correspondence regarding this matter.

**Section 3(k):**  The Company will be paying $5,000 to an individual who introduced the Company to the lead Investor.

# EXHIBIT "B"



# New Moon
## GIRL MEDIA

**Business Plan**
December 2007



# Bringing Girls' Voices
# To the World

**Confidential**

Contact:    Nancy Gruver, Founder and CEO, 651-332-0575
New Moon® Girl Media, LLC
2 West First Street, Duluth, MN  55802

# Table of Contents

EXECUTIVE SUMMARY..................................................................2

BUSINESS DESCRIPTION..........................................................8

MARKET OVERVIEW.................................................................11

OPERATIONS.............................................................................15

LEADERSHIP AND MANAGEMENT.........................................17

HISTORICAL FINANCIALS.......................................................19

FINANCIAL PROJECTIONS.......................................................20

RISKS........................................................................................25

ATTACHMENTS..........................................................................28

# EXECUTIVE SUMMARY

## Introduction

New Moon® Girl Media, a successful, innovative, 15 year old, Duluth, MN based company that publishes an advertising-free, award-winning, international magazine previously positioned "to celebrate girls and build healthy resistance to gender inequities" is transforming itself into "a media company with girls at the center."

CEO Nancy Gruver and her twin 11-year-old daughters founded the "lifestyle" business in 1992 to provide a supportive resource for pre-teen and teen girls to resist unhealthy cultural influences and pressures and develop their individual potential as they transition from girls to women. New Moon invented a unique model that puts girls themselves in charge to identify, research and select issues that are important to girls in their age segment, to develop interesting content, and to learn how to make decisions and use their voices in meaningful and constructive ways to create commercial products and services for girls.

From the start, New Moon recognized and monetized the value of user-generated content and community long before other media companies. New Moon's innovative content creation model meets girls' need to develop power and ownership through their direct involvement, provides current and relevant information not readily available to them in typical tween and teen media, teaches and models respect for their individual and collective abilities, and creates a secure, healthy, creative community they can join.

Eighty percent of the magazine's content is created by girls from around the world and includes non-fiction articles, fiction, poetry, and artwork. A twenty member Girls Editorial Board selects and edits material submitted by girls worldwide, conducts interviews, and works with a graphic designer to create the bimonthly, 48 page, advertising-free magazine that now has a paid circulation of ~20,000 (with readership of 60,000), spread across the United States, Canada and more than 40 other countries. The company has been founder-centered and managed its finances very conservatively. Subscriptions have been generated largely through word-of-mouth, media coverage and limited direct mail campaigns. In the last year more effort has been directed at securing strategic partnerships and affiliations that will leverage the company's ability to increase subscriptions in volume.

New Moon has been recognized by numerous prestigious awards from educators, media, and the child development community and their model of working with girls has since been copied by many other organizations and businesses.

## Market Opportunity

According to the 2000 US census, there are more than ten million girls ages 10-14. There are another ten million girls ages 5-9, and over nine million ages 15-19. Girls age 8-15 are the ages New Moon serves, which means more than 15.8 million US girls. These girls are voracious media consumers through both traditional and web delivery. Of these girls and their parents, New Moon serves a niche composed of middle income and upper-middle income families with highly educated parents (college or above), looking for high-quality media for their daughters.

The traditional magazine and newspaper industry is in serious disruption of its business model, providing a strategic opportunity to New Moon, based on its positioning and the current media

Case 1:16-cv-02753-DLC Document 56-12 Filed 06/02/17 Page 30 of 60

User-created content and community are widely recognized as the future for media today, especially on the internet. It is an attractive and viable market, shown by the great success of sites like Wikipedia, e-Bay and YouTube. New Moon has successfully recognized and monetized the value of user-generated content by girls, and community created by and for girls, for 15 years already with New Moon magazine. There is a ready market for New Moon web communities for girls, building on New Moon's already strong reputation in the niche of high-quality media for girls 8-15.

With the wide adoption of web 2.0 by tween and teen girls, New Moon is extremely well-positioned to take our content creation model to the web, offer online communities for girls, grow dramatically and capitalize on our proven model of putting girls themselves in charge of developing and selecting content in a creative, collaborative and nurturing environment.

Current print and online media for girls ages 8-15 pressure them to "fit in" to unhealthy stereotypes and bombard them with exploitive advertising. Girls are strongly drawn to magazines that focus on appearance, popularity, romance, and advertising. And they are intrigued by web 2.0 sites like MySpace and Facebook because they are a way to connect with other girls.

At the same time, parents are afraid that their trusting young daughter will be negatively influenced by media messages, hurt by internet predators posing as "friends," be cyber-bullied by peers, or will post things online that others can exploit and that she will someday regret having on the web.

Today, girls and parents who are unhappy with the quality of print and online media for girls have very limited options. Many throw up their hands and take the current media landscape "as is," with worry always hovering near by. Others severely limit media access for girls, which may give the illusion of protecting them but doesn't prepare girls for the realities and opportunities of the world they are growing up to live in.

New Moon's solution brings girls together to work as Girls Boards, with adult editors and designers. The Girls Boards are in charge of identifying, researching and providing meaningful, ad-free content created by girls. By focusing on girl-created content and being financially supported by subscribers rather than advertisers, New Moon has strong and deep relationships with our customers, who are both girls and their parents.

The New Moon brand name is recognized by girls, parents and educators as synonymous with a valuable, trusted, safe resource for girls and there are significant opportunities available to expand awareness of the brand to over 3 million girls. New Moon has embarked on an aggressive plan to leverage its brand by creating a brand family, and leverage its user-created content model by segmenting the current product offerings targeting 8-14 year olds into two separate age ranges. One will target the 8-12 year old group and will be primarily delivered through the magazine and an online club. The 13-15+ year old group, a segment that has

business environment.  New Moon will use this opportunity to dramatically grow a user-generated content media company with girls at the center.

The two main reasons for disruption of traditional media businesses are:
- the flight of both readers and advertising revenues to the internet
- the demand from media consumers for user-generated content and user community

rapidly developed to have different needs both with respect to content and form, will be served through a web 2.0 offering. Licensed products will leverage the brands and enhance revenue opportunities.

## Revenue Model

New Moon believes that in the US alone, over 3 million girls, ages 8-15, live in families in the demographic niche we serve. With gross revenues of on average $30/girl per year, the potential US market is believed to be $90 million per year. Other English-language markets including Canada, Australia and Great Britain are logical extensions, especially on the internet.

New Moon sells its products primarily through direct-to-consumer marketing, including direct mail and internet marketing. About 12% of revenues come through subscription agencies and distributor sales (for copies sold in bookstores). Direct marketing will continue to be the primary sales approach, both directly from New Moon and through non-profit affiliates who serve girls and are aligned with New Moon's mission of "Bringing Girls' Voices to the World." In addition, deep strategic partnerships with the leading girl-serving organizations like Girl Scouts of the USA, are being developed and tested for their sales-producing potential. The addition of brand licensing in year 3 of the plan will bring a strong retail component into the revenue mix.

The company's revenues are projected to grow from $750,000 today to $6 million in 5 years. As with any web-based business, there are fixed investments initially but as the brand recognition grows through marketing investments, the model starts to generate significant income and cash in future years. An additional advantage that New Moon has is that periodical media sells the product to the customer for a period of time extending into the future. Cash comes in at the beginning of a subscription, while the production expenses are spread over the full subscription period. This means that as sales increase, cash flow increases immediately, even if profitability has not yet been achieved. New Moon already has a steady cash stream from the existing magazine business that will also provide increasing contributions as subscription numbers increase due to increased marketing.

Significant Revenue Sources

- Annual subscriptions to New Moon magazine (8-12 year old segment)
- Annual memberships to LunaVida online club (8-12 year old segment)
- Annual memberships to orb28 online community (13-15 year old segment)
- Licensing of all 4 New Moon brands

### New Moon 5 year Pro Forma Income Statement ($ 000's)

|  | 2007 Total | 2008 Total | 2009 Total | 2010 Total | 2011 Total |
|---|---|---|---|---|---|
| Revenues |  |  |  |  |  |
| 8-12 Segment | 646,800 | 1,304,341 | 1,722,586 | 2,130,318 | 2,571,300 |
| 13-15 Segment | 0 | 69,000 | 722,625 | 1,607,313 | 2,780,905 |
| The Club Segment | 50,669 | 54,197 | 266,510 | 518,583 | 661,000 |
| Other | 61,537 | 56,400 | 0 | 0 | 0 |
| Total Revenue | 759,005 | 1,483,938 | 2,711,721 | 4,256,214 | 6,013,205 |

| | | | | | |
|---|---|---|---|---|---|
| Gross Margin | 360,286 | 606,988 | 1,592,791 | 2,826,245 | 4,068,529 |
| % of Sales | 47% | 41% | 59% | 66% | 68% |
| Total Sales and Marketing | 338,499 | 555,872 | 735,843 | 1,054,260 | 1,346,009 |
| Tot General Administrative | 311,482 | 442,529 | 493,555 | 539,407 | 548,389 |
| Total SG & A | 649,981 | 998,400 | 1,229,398 | 1,593,667 | 1,894,398 |
| Tot Product Development | 114,600 | 275,706 | 332,237 | 373,715 | 388,034 |
| EBITDA | (404,294) | (667,118) | 31,156 | 858,863 | 1,786,097 |
| Other Income | (1,849) | 0 | 0 | 0 | 0 |
| Other Expense | 4,705 | 2,500 | 0 | 0 | 0 |
| Net Other Income | (6,554) | (2,500) | 0 | 0 | 0 |
| EBTDA | (410,849) | (669,618) | 31,156 | 858,863 | 1,786,097 |
| % of Sales | | | 1.15% | 20.18% | 29.70% |

## Offering and Use of Proceeds

In order to accomplish New Moon's aggressive growth plans, additional resources including staff, infrastructure, and technical capabilities will be required.  It is estimated that New Moon will need $1.25 million to fund growth for the foreseeable future.  $250,000 of this total has already been invested by the current owners.  The majority of the funds will be used to increase staff, particularly in marketing, expand internet marketing, and to support the web communities' development and operation.  It is expected that New Moon will achieve profitability within 24 months, with positive cash flow occurring within 12 months.

## Investment Highlights

Innovative Content Model:  New Moon's proven expertise in producing media created by girls gives it a significant lead in the media race to leverage user-created content.  Being the recognized print leader in content by girls that is for girls, the company already has the consumer (both girls and parents) trust of its content's quality that is key to a successful internet media strategy for children.

Brand Family Development:  A new family of four appealing New Moon brands has been created.  New Moon is already a registered trademark of the company and trademarks are in application for the 3 new brands.

Stockpile of Timeless Content:  New Moon's ownership of fifteen years worth of timeless, high-quality, girl-created content positions the company to be able to use, re-mix, and re-use that content in print, on the internet, in licensing, and potentially in other media.

<u>Valuable Niche:</u>  The company's niche of affluent girls ages 8-15, and their highly-educated parents, are dedicated media consumers and also sought after for their high level of consumer activity and awareness.

<u>Timely Business Model:</u>  Internet communities built around user-generated content are coming into their own through web 2.0 technology.  At this point, the first professional-quality, girl-only, user-generated internet community has yet to appear on the web.  New Moon expects to be the first.  In addition, in 2006, consumer-supported media surpassed advertising-supported media in terms of use and popularity for the first time ever.  This trend of consumer acceptance of and preference for ad-free media has been accelerating and shows signs of strengthening.

<u>Strong Relationships with Leading Girls' Organizations:</u>  The company already has built enduring positive relationships with all the major organizations that serve girls ages 8-15 in the US.  In May, 2007 an agreement was executed with the Girl Scouts of the USA which will provide opportunities for New Moon to leverage their marketing efforts to these 1 million plus target girls, for Girl Scout girl writers to contribute to the magazine, and for the two organizations to develop numerous other affiliations, interactions, and potential revenue opportunities within the regional Girl Scout Council organizations.

<u>Leadership:</u> Nancy Gruver, founder and CEO, a nationally recognized leader in the movement to empower girls and foster their creativity and self-confidence, leads the company.  Sandy Smith, COO, has 15 years of experience in the publishing industry.  Paulette Warren, Chief Marketing Officer, joined New Moon in June, 2007 and brings 20 years of marketing, brand development, web content management, and marketing communications experience.  Cathy Connett of CorConnections served for the past year as an advisor on financial projections and business transformation.  An unofficial but very engaged Board of Advisors has been in place for the last year and includes Chris Mahai and Linda Ireland of Aveus.  They will continue as key advisors but a formal Board of Directors is being formed in January 2008, with Chris Mahai as Chair.  An Expert Advisory Board of 10 nationally recognized, academic and industry leaders in child development as well as media has been in operation starting in 2007.

<u>Exit Strategy:</u>  The company is expected to be an acquisition target in 5-7 years because of the value of its brand family, the value of the market niche it serves (girls ages 8-15 from affluent, well-educated families), as well as the value created by New Moon's unique model that captures and engages girls and their imaginations.  In the children's media business, acquirers buy niches, especially those where the consumer-company relationships are deep and loyal.  Typical acquirers in this space look at smaller companies and bring them in because of a valuable niche, an innovative source of content, the opportunity to cross-market their other media properties to that niche, and the opportunity to increase profit by sharing costs across several media properties.  In the past few months, Disney has acquired Club Penguin, a small company whose only product was a subscription website for young children.

## In Summary

New Moon addresses an unmet need in a significant market:  it is the only media company that involves many 8-15 year old girls around the world directly in creating high-quality, healthy, ad-free media for their peers and hits the sweet spot of value for both affluent girls and their parents.

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

# BUSINESS DESCRIPTION

## Existing Business Model

In 1992, with 11-year-old twin daughters entering adolescence, Nancy Gruver felt the anxiety many women experience when remembering their own adolescence. Too often, it's a time when what girls expect of themselves and what society expects of them clash, and many girls give up their voices and their dreams as a result. Searching for effective support to help her daughters make a healthy transition from girlhood to womanhood, Nancy found that there were no practical, accessible resources. Being an entrepreneur, and together with her daughters, Nancy decided the best solution was to create a new category of resource: a magazine where girls themselves would make the decisions on content and where girls and adults would "share the power" in the creative process. In the process, New Moon broke some long-standing rules in magazine publishing, both by putting girls in charge and by not accepting or relying on advertising revenue.

The seed was planted and nine months later the inaugural issue of *New Moon®: The Magazine for Girls and Their Dreams* was available for sale. Nancy chose to create this entity as a socially responsible for-profit business because her vision was of a resource for girls, created by girls that would be supported by girls and parents buying subscriptions. She wanted New Moon to be accountable primarily to its subscribers and that has proved to be a great asset in the unusually high level of trust, loyalty and credibility New Moon has with its readers, their parents, and countless experts in girls' development. She wanted the organization to be challenged by direct accountability to its market of girls and their parents, with the discipline of a for-profit competitive business.

From that seedling, the business grew into a lifestyle business and remained profitable over the years by pioneering a business model where girls and adults work hand-in-hand as peers, to create a publication that gives 8-14 year old girls a chance to explore and express themselves, their dreams and their ideas. Eighty percent of the magazine's content is generated by girls from around the world and includes articles, fiction, poetry, and artwork. A twenty member Girls Editorial Board edits material submitted by girls worldwide, conducts interviews, and works with a graphic designer to create a bimonthly, 48 page, advertising free magazine that now has a paid circulation of 25,000, spread across the United States, Canada and more than 40 countries. The vast majority of subscribers are in the U.S. with 85% in U.S. Metropolitan Areas (the geographic distribution of New Moon's subscription base is found in Attachment I). The exclusion of advertising is an important strategic decision because it allows New Moon to be accountable only to the readers and their needs, and to avoid the "perfect girl" stereotype portrayed in most other media and accept girls as they are, listening to them, and celebrating their diverse experiences and dreams. In the past 12 years, New Moon's model has influenced many girl-serving organizations, for-profit as well as non-profit, to allow girls increased involvement in decision making.

The fact that the business has remained profitable without advertising revenues or extensive marketing over its 15-year history and has won numerous awards from educators, the media, and the child development community is testimony to the valuable service being provided. For example, the Parents' Choice Foundation has awarded *New Moon* the Gold Award for Best Children's magazine in six of the fourteen years that the magazine has existed, with Silver and other awards from this group in three other years. In 2006 *New Moon* won educational

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

publishing's highest honor, the Golden Lamp Award, from the Association of Educational Publishers, triumphing over highly respected finalists *National Geographic Kids*, *Teaching Tolerance*, and *Edutopia Magazine*. (Further details on awards is found in Attachment IV.)

Having successfully established New Moon, for the last five years Nancy was also actively involved in launching a related non-profit, Dads & Daughters, whose mission is to make the world safe and fair for our daughters. Dads & Daughters contracts for some services from New Moon and Nancy served as the part-time Executive Director and major fund raiser for the organization. Nancy transitioned out of Dads & Daughters in mid-October, 2007 in order to devote her attention fully to the growth plans of New Moon.

## Business Opportunity Description

With significant change in business models (caused by the internet) occurring in the magazine industry, Nancy and the New Moon team saw an opportunity to fill a new need for girls ages 8-15: a respectful, secure, dynamic, creative online community for self-exploration and connection with other girls. There are significant opportunities to leverage the unique New Moon business model and the highly respected brand that they have created. Girls today continue to need healthy resources to help them transition from girls to women, to help them safely negotiate the challenges of adolescence, to empower them as individuals, and to help them learn how to make their voices heard in the world. The processes that New Moon has developed and honed over the past 15 years, which "Bring Girls' Voices to the World" and "Share the Power," comprise a unique model that provides value because it supports and develops girls in four fundamental ways:

1. Power & Ownership: Develop girls' power and ownership through content creation and direct involvement in the business decisions of the company, so girls see themselves in the products and services, and they feel a personal stake in the development of the company and their communities.

2. Current and Relevant Information: Provide girls the opportunity to not only receive reliable information that is difficult for them to get through other sources, but also engage them in the creation of the content (in all forms) and participation opportunities in a variety of forums that give them new skills and knowledge, along with the tools and techniques that girls can apply to their own interests and development.

3. Respect: Demonstrate New Moon's core values through direct engagement with the girls, and through all business operations, teach and model respect for girls' individual and collective abilities. Through branding and communications initiatives, raise the profile of girls' voices and demonstrate their value to others around the world.

4. Community: Create opportunities for girls to be members of a community through print, online, and in person to build safe (physically, emotionally, and intellectually), girl-respecting communities that are free from outside influences (ad-free) and directed by girls themselves, with support and guidance from adults.

A strategic planning process was initiated in 2006 and a decision was made to transform the business from its previous status as a successful "lifestyle business" publishing company that "celebrates girls and builds healthy resistance to gender inequities" into a growth "media company with girls at the center that brings their voices to each other and to the world as they explore, discover, create, and grow." New Moon recognized that its well-developed user-

generated-content business model positioned it strongly to meet the challenges of change in the magazine industry. A key strategy in this plan is to leverage the growing opportunities in the Web 2.0 environment to connect with many more girls providing many more products and services targeted for their needs.

The New Moon team is implementing a plan to use their unique business concepts to expand their products, services, and segments resulting in a hundredfold extension of their brand awareness to over three million girls by the year 2011. This growth will require additional capital for the business expansion but it also creates an opportunity for the business to attract investors and other strategic partners. The ultimate outcome will be that many more girls and the larger community will benefit from the mission of New Moon.

# MARKET OVERVIEW

In the US alone, according to the 2000 US Census, there are more than ten million girls ages 10–14.  There are another ten million girls ages 5–9, and over nine million ages 15–19.  There is also substantial growth in the girl population outside the US, particularly in developing countries such as China and India. In other words, there is <u>plenty of market potential</u> available to New Moon and <u>all girls</u> have common interests and needs that align with New Moon's areas of focus.

## Attainable Market

<u>Geography</u>: While there is a very broad market potential for the company, from a focus and 'attainable market' standpoint, New Moon is essentially an English language company. Additional language content development is likely at some point in the future. However, the practical, immediate path for the company is to focus its growth within the United States, Canada, Australia, and Great Britain before stretching too far into other global markets. (Global expansion of any magnitude will be an Internet-driven strategy, and New Moon will, as it does today, continue to welcome participation of girls from around the world. It is just not a focus of this strategic plan to grow globally.)

New Moon's plan is based on reaching 75,000 girls with its print product, 225,000 girls via the web, and becoming a known brand to 3 million girls and their families.  In other words, it takes a very small market penetration for New Moon to accomplish its growth goals and achieve dramatic results for the girls, their families, and the company.

<u>Segmentation</u>:  Conversations with and involvement of girls in the development of New Moon to date, as well as secondary research, confirms a distinct shift in needs for girls 8–12 years old and 13–15+.  Historically, New Moon did not segment these age ranges, but now recognizes significant opportunity in creating content and services that more directly target the differing needs of these two segments, as well as their parents and other loving adults involved in the girls' lives and development.

<u>Target Markets</u>: With the new plan, New Moon now targets three distinct and complementary target markets:

1) <u>8 – 12 year-old girls</u>: The ideal candidates for New Moon are girls who:
   a)  Have self awareness
   b)  Are intent on being taken seriously
   c)  Are enjoying their girlhood
   d)  Are smart, intellectually curious, interested in a variety of subjects, and want to learn
   e)  Feel a need for a community of girls, friendships, and family
   f)  Are beginning major physical/body/emotional changes of puberty
   g)  Are interested in active engagement in the development of themselves, other girls, and New Moon
2) <u>13 – 15+ year-old girls</u>: The ideal candidates for New Moon are girls who are:
   a)  'Trying on' their independence
   b)  Activists – using their awareness to make change
   c)  Intent on being taken seriously

d) Aware of conflicts in the world, the mixed messages delivered to girls, and who may have experienced being ignored or not taken seriously
e) Aware of disrespect of them and other girls
f) Aware of the transitional phase they are in – identifying themselves as a teenager/young adult (not a girl but can't drive yet)
g) Going through major physical/body/emotional changes of adolescence

3) <u>Parents/Adults who care about girls</u>: These are loving adults in a girl's life who:
  a) LOVE their girl and want them to succeed
  b) Worry about their girl
  c) Are very involved in their girl's life
  d) Worry about doing 'the wrong things' and messing up their girl (daughter)
  e) Are looking for help, resources that won't discount their role/parenting
  f) Recognize that girls often reject parental information and want a trusted resource to guide their girls
  g) Are looking for someone to reinforce positive messages to their girl.

## Industry and Competition

The company has previously defined itself as a publisher, and so compares itself primarily to companies that are creating content for girls, either in print or online. With the changes in the magazine industry and the need for magazines to monetize their websites, New Moon has looked at both magazines and stand alone websites as competitors in its growth plan. There are dozens of popular magazines designed for girls as well as several websites and products or programs that serve young girls. Magazine examples include *Girl's Life, American Girl, Discovery Girl,* and *Seventeen*. Websites are varied; two examples are *CartoonDollEmporium.com,* and *MissOandfriends.com.*

The magazines tend to focus almost exclusively on pop culture and fashion/style, even if they promote themselves as serving girls. Almost all have advertising-based revenue models and much of the editorial relates directly to products being promoted in the ads. *American Girl* magazine also has a very comprehensive branding strategy that crosses books, dolls, clothing, and other merchandise.

The websites range from sites about girls for parents and professionals to sites designed by and for girls. Some are for profit, others not. Most of the more comprehensive sites targeted specifically to girls rely on partnerships, books, and other merchandise sales, as well as advertising, to support the site. Many of the sites use animation and 'avatars (characters)' to represent girls, and to serve as fictional hosts to the content throughout the site. The quality and variety of the websites is very broad and no one seems to have a significant advantage over others yet, although Beacon Street Girls and Miss O and Friends are impressive and clearly developing rapidly. Other websites for children like Club Penguin (recently acquired by Disney) are membership websites that rely on subscription revenues (monthly or annual) to support the site.

None of the dozens of competitors in the girls magazine or website industry is a direct match or replacement alternative to New Moon. Many of them have aspects of their businesses that are similar, but none of them have the specific mission, focus, or active girl involvement that is uniquely New Moon.

Many of the experts, resources and competitors in the marketplace reference New Moon. Some of them might be great potential partners as the company pursues its strategy of partnering to increase market awareness of New Moon and generate subscription and membership sales.  Almost all of the academic sources reference New Moon, and most place it as one of the top resources for adolescent girls.  Additionally, Nancy Gruver, founder, CEO and author, is nationally recognized for the work she has done in building New Moon and empowering girls.

## Products and Services Overview

As New Moon moved forward with its growth plan in 2007, it has initiated several changes in its print and web-based offerings to girls.  New print, online, merchandise and activity-based services will develop following the needs and interests of the newly segmented discrete age segments.  New Moon will be a family of brands serving the two separate age segments.  The magazine will be positioned for 8-12 year olds, as will the companion LunaVida online club. Orb28 will be the completely online community for 13-15 year old girls.  Growth will be created by the expansion of New Moon's products and services over time from essentially a single print publication (with minor ancillary services), to a fully integrated line of products and services for the three target markets of girls 8-12, girls 13-15, and parents/loving adults of those girls.

Entirely new branding has been developed and will be launched in late 2007, through a new company website, a new website for New Moon Magazine and in the January-February issue of the print magazine.  The new brands reflect New Moon's history while signaling the bold new approach the company is taking to serve many, many more girls in the next five years.



**Growth Plans**

Key Strategies:

1) <u>Build the New Moon Brands</u> – Specifically:
   - Make New Moon a household name in 3 million homes
   - Create/extend the key messages of trustworthiness and authenticity
   - Promise: core brand message tied to the mission of "bringing girls voices to the world"
   - Position New Moon as the experts on evoking and presenting girls' voices – be recognized for this by 3 million people
   - Develop a licensing plan/principles for the use of the New Moon brands

2) <u>Expand the Product and Services Portfolio</u> – Specifically:
   - Expand the concept of content and community as the core product
   - Reduce dependence on print revenue
   - Use online as the main platform for growth
   - Stop direct merchandising of New Moon ancillary products
   - Expand events and experiences

3) <u>Pursue High Visibility Partnerships</u> – Specifically:
   - Tap the resources of trusted others to support New Moon growth and mission

4) <u>Expand the Participation of Girls</u> in New Moon – Specifically:
   - Enroll them as brand ambassadors
   - Expand their ability to contribute to products and services (creative, direction)
   - Enlist their help in creating awareness and in distribution/networking efforts and to support reach activities
   - Provide membership opportunities to increase interaction and involvement

5) <u>Create and Implement a Value Pricing Plan</u> – Specifically:
   - Investment pricing to support the value proposition

6) <u>Segment the Customer Groups</u> to provide more focused solutions to their needs – Specifically:
   1. 8 – 12 year-old girls
   2. 13 – 15+ year-old girls
   3. Parents and others who care about girls ages 8-15+
      (Build/design services for girls; enroll parents/adults as customers to support girls)

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

# OPERATIONS

<u>**Milestones**</u>

1. <u>8-12 New Moon Magazine</u>: The magazine and its Girls Editorial Board (GEB) started in the 1st quarter of 2007 to move the content focus of the magazine toward a younger audience (8-12) and will complete this transition with the January-February 2008 magazine.

   New Moon has an aggressive program to develop 2 or 3 key partnerships and a number of affiliate programs to drive magazine subscriptions.  Partnerships are envisioned to be a major source of new and renewal subscriptions for New Moon magazine and ultimately for the online products.

   A national partnership with the Girl Scouts of the USA was executed in May 2007.  This is a major milestone because 1 in 9 girls in the target age group are Girls Scouts; this represents 1.8 million girls.  The agreement provides a partnership that will allow the Girl Scouts to provide a girl writer for an article in each magazine and will provide revenues for the Girl Scout Councils from each New Moon subscription obtained through weblinks on the GSUSA site and various Council sites.  Additionally, this relationship provides credibility for New Moon's targeted activities at the Council level.  Prototype programs that include activities and curriculum based on New Moon content, which can be used at the troop level, are being piloted in Fall 2007.  Full rollout of the Girl Scout program is planned for February 2008.  Additional activities, such as complementary badge work that provides opportunities for girls to express themselves, or products that might be sold through the GS Councils' retail stores, are being explored for the future.

   A national partnership beginning in 2008 with the Women's Sports Foundation will feature New Moon content on WSF's popular website and in its e-news, and through WSF's Go Girl Go program that reaches over 500,000 girls, parents and coaches annually.  Additional partnerships that will drive subscription revenues as well as broaden the visibility of the New Moon brand are envisioned for the future.

   The New Moon affiliate program is based on establishing relationships with key non-profit women's and girls' groups who value New Moon's mission of "Bringing Girls' Voices to the World."  Affiliates will provide a link on their website to order New Moon and feature New Moon content in their communications with members.  Since parents or other influential adults are major initiators of the subscriptions for younger girls, these relationships are meant to drive subscriptions by providing a commission for subscriptions obtained from an affiliated site.  Current affiliates with significant membership include the American Association of University Women, the National Organization for Women, Feminist.com, the Feminist Majority Foundation, and The White House Project.

2. <u>orb28</u>: Product development for the New Moon online product for the 13-15 year old age group has started.  Focus groups were conducted during the 1st and early 2nd quarters of 2007.  A Girls Web Editorial Board of 28 girls from around the U.S. is 80% selected and met for their kick-off retreat in October, 2007.  Initial product concepts were well-defined during the retreat and .  An aggressive growth plan for initial rollout of this product in late March 2008 is incorporated in New Moon's growth plan.

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

3. LunaVida: The New Moon Club: A beta version online club was developed in 2007 (for girls aged 8-14) to serve two purposes. First, it is a way to provide more content value to girls who are subscribers to the print magazine, which strengthens the bond with customers, and adds revenues. Secondly, this is an important vehicle to test online content and to build a system in the company to provide online content on a regular real-time basis. Once orb28 is launched in March, 2008, the LunaVida Club will be targeted to the 8-12 segment.

4. Brand Development: Work will be complete by the end of 2007 to expand the family of brands to include a brand for the 13-15+ segment and to clarify the identity of and relationships between the New Moon brands.

5. Merchandise: Licensed merchandise will be added to the product offerings in year 3 of the plan.

6. Events: New Moon events for girls and for girls and parents will be piloted in year 3 of the plan to test their potential for generating additional revenue and increasing awareness of the brands.

**Infrastructure**

In order to implement its key strategies, New Moon has embarked on a plan that requires creating an infrastructure for growth. This has included the addition of several new contract relationships to help develop the structure and personnel that will support the growth plan.

Aveus, a global strategy and operational change firm based in St. Paul, MN, assisted New Moon in developing their new strategy in 2006 and is engaged to continue providing strategic support to the firm. Chris Mahai and Linda Ireland, two of Aveus' leaders, are particularly involved and provide guidance in the strategy and marketing areas, using their experience in marketing and the media industry. They are also a tremendous source of resources for the firm as it uses outside firms to assist with branding, identity development, and PR.

Cathy Connett, founder of CorConnections, a business that catalyzes change within organizations, has provided specific operational support to transform the organization to the next level. This includes developing the specifics of the business plan, the pro forma financials, the organizational structure and resource needs, and organizational transformation that will support the new business.

In addition, New Moon is also adding key staff positions to build the infrastructure for growth.

New Moon's first Chief Marketing Officer joined the company in late June, 2007. This position is driving the branding efforts across all segments, the development of new online products for both age segments, expanded value pricing, and an aggressive marketing and public relations campaign to extend New Moon's reach and recognition.

A Website Producer was hired in November, 2007. This position identifies appropriate online technologies for new online products, identifies emerging online needs of our customers, and provides appropriate online metrics and analyses of online customer performance to support the on-going business needs.

## LEADERSHIP AND MANAGEMENT

Nancy Gruver, CEO:  Nancy is the founder of New Moon and is a nationally recognized leader in the movement to empower girls and foster their creativity and self-confidence.  She is a serial entrepreneur having started several small businesses but the passion she has for empowering girls and assisting them in their development has been a lifelong passion.  She has supplemented this passion with academic training, achieving a MPA in 1996 from Harvard University Kennedy School where she studied and worked with Dr. Annie Rogers, an expert on girls' development, and part of the Harvard Project on Women's Psychology and Girl's Development.  Gruver's work puts her in contact with thousand of girls, their families, and professionals who work with girls and she shared some of the knowledge from this work in her 2004 book, How To Say It To Girls.

Sandy Smith, COO: Sandy has been with New Moon for 8 years, starting as a part time circulation assistant, and has been instrumental in helping it grow.  Prior to joining New Moon, she held a variety of positions at Lake Superior Magazine in Duluth.  Her undergraduate degree includes a focus on sociology and juvenile corrections and is from the University of MN- Duluth.

Paulette Warren, Chief Marketing Officer:  Paulette joined New Moon in June 2007 and brings 20 years of marketing, brand development, web content management, and marketing communications experience.  She has experience in both the for profit and non-profit environment and has performed successfully in both small and large companies.  Her marketing experience, knowledge of the web and the children's and adolescent Web 2.0 environment will be a major asset for New Moon.

Brian Kei Tanaka, Web Producer:  Brian joined New Moon in November 2007 and brings more than 10 years of professional experience with technologies such as Unix, Apache, Perl, PHP, and MySQL for companies such as The WeLL, Silicon Graphics, Intuit, Nintendo, and RealNetworks. In addition, he has worked with web standards, CSS, javascript, and related technologies.  He is the author of Take Control of Permissions in Mac OS X as well as articles for Linux Journal, LinuxWorld, and Sys Admin.

**Board of Directors:**  Currently, there is an unofficial but very engaged Board of Advisors that has been in place for the last year and which includes Chris Mahai and Linda Ireland of Aveus. A formal company Board of Directors will be in place by January 2008, led by Chris Mahai as Chair.  This Board will consist of 5 members and include Nancy Gruver and Chris Mahai as the only two inside directors.  Currently, one other board member has agreed to serve.

Chris Mahai, Chair of Board of Directors: Chris' career includes more than 20 years of experience in leading, developing, and implementing business and marketplace strategies. Her work has spanned a variety of corporate, entrepreneurial, consulting, and general management responsibilities across several industries. Additionally, Chris serves on the board of several businesses and non-profit organizations. She is an active investor in women-owned and led businesses.

During her corporate career, Chris held several senior-level positions at Cowles Media/Star Tribune, including senior vice president and general manager of markets and products. Chris also spent nearly fifteen years in the financial services industry, including several senior vice president positions at First Bank (now US Bank.)

Erica Gruen, Principal, Quantum Media: One of New York Magazine's inaugural "Cyber 60" and an Emmy Award-winning television producer, Erica Gruen has been a recognized leader of startups and turnarounds in new media technologies, television, and advertising for 20 years. She is currently a "venture catalyst" for Internet and media start-ups: troubleshooting management and marketing strategies and business development, and using her know-how, perspective, and contacts to help young companies and projects grow faster. Previously, as President and Chief Executive Officer of the Television Food Network and foodtv.com, she guided Food through a major turnaround during two mergers, bringing it into the black on advertising revenue alone: the only cable network in the U.S. to ever do so. Erica doubled the subscriber base of the TV network, tripled primetime viewership, tripled revenues, and nearly tripled the value of the venture. She also launched foodtv.com and made it the #1 food site on the Web, profitable from its first year. Erica also launched Food's publishing and events businesses, oversaw the network's brand extensions into merchandising and licensing, launched in Canada, Japan, and Europe, and ran one of the most active TV studios in the U.S., including introducing the smash hits Emeril Live!, The Two Fat Ladies, and The Iron Chef.  Erica is the Immediate Past Chair of the Women in Cable and Telecommunications Foundations and is an honorary chair of Cable Positive. She is a Director of Narrowcast Communications Inc. and is on the Advisory Boards of America To Go; Yack; Visionary Media; and Diva Capital.

Two additional Board members will be recruited for their expertise in marketing strategy and implementation, Internet specific technical and consumer expertise, and relationships with major media players.

**Expert Advisory Board:** This board was formed in early 2007 to provide expert professional advice to the company regarding child and adolescent development as well as media issues relevant to this age group.  Members are well-recognized experts and researchers on girls and girls' media.  They are not compensated but provide advice on developmentally appropriate product positioning, direction and new services at quarterly board meetings.  They also act as New Moon ambassadors in the various activities with which they are engaged.

- Dr. Jo Ann Deak, Resident Scholar for the Gardner Carey Leadership Institute in Colorado Springs. Expert on environment, school, and family patterns that lead to healthy development of children.
- Dr. Renee Hobbs, Director Media Education Laboratory at Temple University and co-founder of Alliance for Media Literate America.  One of the nation's authorities on media education.
- Anastasia Goodstein, publisher of Ypulse, an independent blog for teen/youth media and marketing professionals, and author.
- Dr. Dianne Neumark-Sztainer, Professor at University of MN in the Epidemiology and General Pediatrics divisions.
- Dr. Lyn Mikel Brown, Professor of Education and Human Development at Colby College. Acclaimed academic in the area of girls' and social and psychological development.
- Dr. Cheryl Dellasega, Associate Professor at Penn State College of Medicine. Research and publishing dealing with issues of adolescent girls.
- Dr. Harriet S. Mosatche, Vice President of Program Collaboration and Initiatives for Girl Scouts of the USA.  Expert in child and adolescent development.
- Audrey Brashich, free-lance writer in teen and women's journalism.
- Dr. Marcia Brumit Kropf, Chief Operating Officer of Girls Incorporated, national non-profit inspiring girls to be strong, smart, and bold.

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

- Dr. Deborah L. Tolman, Director of the CGRS and Professor of Human Sexuality at San Francisco State University.  Developmental psychologist who is widely recognized for her contributions to female adolescent development.

# HISTORICAL FINANCIALS

New Moon has been profitable over the period since 1993. The business model has been based on selling annual subscriptions, currently priced at $34.95/ year that provide 6 bimonthly, advertising-free magazines over the course of one year. The company has experimented in the past to offer special events and New Moon merchandise but at a reduced level from what's envisioned in this plan. Annual sales have averaged $850,000 from 2003 to 2006 with $660,000 attributed to magazine sales, $95,000 from other activities like events and merchandise, and $120,000 from contract services provided to Dads & Daughters. EBITDA has averaged 2.9 % Sales over the 4 year period. Historical Income Statements and Balance Sheets are provided as Attachments II and III. (Due to past accounting issues that were corrected in 2006, the 4 year average of 2003-2006 Income Statements, also shown in the attachment, is a more accurate measure of past performance than any one year.)

The magazine portion of the business has an annual distribution base of ~25,000, which has remained fairly constant over the 2003-2006 period with a gross margin of 53.5% Sales, sales and marketing costs of 32.0% Sales and G&A of 21.4% Sales. Approximately 80% of the magazines are distributed directly to the reader with 20% being sold through distributors.

The majority of magazine subscriptions have been obtained through strong word-of-mouth, media coverage, the internet, and direct mail campaigns; although within the last year, there has been a much more concerted focus on driving subscription acquisition through affiliate relationships. Approximately 20% of current subscriptions come through affiliates, with the majority of those coming from Google. Affiliates receive discount pricing and/or commissions. The focus going forward is to develop affiliations with organizations that provide not only visibility but opportunities for more direct engagement of the affiliate's community with New Moon's mission, content, activities, or online community.

Prior to fall 2007, New Moon had no debt and maintained a conservative approach to the business, including maintaining a large amount of cash, equivalent to the outstanding deferred revenues from subscriptions. Industry metrics indicate that at least half of this cash can be utilized to fund growth in the short term.

# FINANCIAL PROJECTIONS

The five year pro forma provided in Attachments IV, V and VI detail the financial side of New Moon's growth plan. This growth will be driven by segmentation of customers into two age groups, organic growth of the 8-12 year old magazine segment, Web 2.0 products for both segments, and licensing of the New Moon brand in years 3-5. Growth will be funded from internal cash flow as well as $1 million from angel investors to be secured in up to two funding rounds closing by mid-year 2008. Interim cash flow needs are being met through a line of credit from Park State Bank.

The growth plan is built on the following financial foundation:

- Expand magazine subscriptions to drive short term cash flow to support operations and help fund the investment required by to develop Web 2.0 business.
- Build Web 2.0 structure primarily for 13-15+ segment, using current cash flow and investor funding, but further develop and enhance it to provide additional value to the 8-12 segment.
- Leverage existing content by monetizing customer value offered via deeper access to existing content provided by membership in The LunaVida Club.
- In year three, add product licensing, merchandise and test events to product offerings to both leverage brand and to drive incremental revenues.
- Service revenue from contract services provided to Dads and Daughters is projected to decline in 2007 and 2008. No revenues are projected from this source in 2009 and beyond.

Table 1:  Five year Pro Forma Income Statement (Dollars)

|  | 2007 Total | 2008 Total | 2009 Total | 2010 Total | 2011 Total |
|---|---|---|---|---|---|
| Revenues |  |  |  |  |  |
| 8-12 Segment | 646,800 | 1,304,341 | 1,722,586 | 2,130,318 | 2,571,300 |
| 13-15 Segment | 0 | 69,000 | 722,625 | 1,607,313 | 2,780,905 |
| The Club Segment | 50,669 | 54,197 | 266,510 | 518,583 | 661,000 |
| Other | 61,537 | 56,400 | 0 | 0 | 0 |
| Total Revenue | 759,005 | 1,483,938 | 2,711,721 | 4,256,214 | 6,013,205 |
|  |  |  |  |  |  |
| Gross Margin | 360,286 | 606,988 | 1,592,791 | 2,826,245 | 4,068,529 |
| % of Sales | 47% | 41% | 59% | 66% | 68% |
|  |  |  |  |  |  |
| Total Sales and Marketing | 338,499 | 555,872 | 735,843 | 1,054,260 | 1,346,009 |
| % of Sales | 45% | 37% | 27% | 25% | 22% |
|  |  |  |  |  |  |
| Total General Administrative | 311,482 | 442,529 | 493,555 | 539,407 | 548,389 |
| % of Sales | 41% | 30% | 18% | 13% | 9% |
|  |  |  |  |  |  |
| Total SG & A | 649,981 | 998,400 | 1,229,398 | 1,593,667 | 1,894,398 |
| % of Sales | 86% | 67% | 45% | 38% | 32% |
|  |  |  |  |  |  |
| Tot Product Development | 114,600 | 275,706 | 332,237 | 373,715 | 388,034 |
| % of Sales | 15% | 19% | 12% | 9% | 6% |

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

| | | | | | |
|---|---|---|---|---|---|
| EBITDA | (404,294) | (667,118) | 31,156 | 858,863 | 1,786,097 |
| % of Sales | | | 1% | 20% | 30% |
| | | | | | |
| Other Income | (1,849) | 0 | 0 | 0 | 0 |
| Other Expense | 4,705 | 2,500 | 0 | 0 | 0 |
| Net Other Income | (6,554) | (2,500) | 0 | 0 | 0 |
| | | | | | |
| EBTDA | (410,849) | (669,618) | 31,156 | 858,863 | 1,786,097 |
| % of Sales | | | 1.15% | 20.18% | 29.70% |

The company expects to drive revenues to just over $6 Million with an EBITDA of $1.8M in 2011.  The expectation is that New Moon will be an attractive acquisition target at that time. Typical multiples for media acquisitions in the print-only sector are two to three times annual revenues.  Typical multiples in the internet sector are much higher.  The projected return shown in the Capitalization worksheet (Table 6) is estimated conservatively at a multiple of 1.67.

A potential acquirer will be interested in the value that can be obtained from any/or all of the following components:

- A brand image that is known, definable, has market value, and can be leveraged by the acquirer.
- A definable, loyal audience.
- Processes, concepts, or relationships, e.g., partnerships, which are reproducible and continue over time to attract a particular segment.
- A target audience that is big enough to be of interest and for which the messages, concepts, and/ or processes that attract them are sustainable and leveragable.


### Growth Initiatives Financial Discussion

**Expand Magazine Subscriptions:**

One of New Moon's top short term priorities is to drive subscription growth as a mechanism to drive cash flow.  The significant contribution margin from the additional subscriptions as well as utilization of cash accumulated from deferred revenues provides cash for the company's transition.  Subscription growth will be driven through additional affiliate relationships, National and Council level agreements with the Girl Scouts, and direct mail activities.  Renewal rates will also be driven upwards through focused marketing efforts. The projected growth is shown in the table below.

**Table 2:  Five Year 8 -12 Year Old Magazine Subscriptions Growth Projections**

| Year End | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| Total Cumm Active Subscriptions | 17,000 | 25,900 | 42,000 | 51,600 | 61,800 | 71,400 |
| Renewal | 45% | 45% | 45% | 45% | 45% | 45% |

| Rate | | | | | | |
|------|---|---|---|---|---|---|
| **New I** | | | | | | |
| % Direct orders | 30% | 25%% | 17% | 11% | 10% | 9% |
| % thru Affiliates | 10% | 15% | 18% | 20% | 17% | 12% |
| % thru Girl Scouts | N/A | pilot | 7% | 12% | 18% | 25% |
| % thru Agencies | 15% | 15% | 13% | 12% | 10% | 9% |
| **Totals** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

Expanded marketing efforts began in the fall of 2007 with the addition of a Chief Marketing Officer and investment in brand development. The marketing investments are directed at both leveraging the tremendous value already attached to the New Moon brand (but which is not as widely known as possible) as well as leveraging the brand to be able to serve two market segments, the 8-12 year old and the 13-15+ year olds. Sales and Marketing costs which represented 23% of total corporate sales in the last four years are expected to rise to 41% of sales in 2007 but decline to 23% of a larger sales base in 2011.

Build Web 2.0 Structure and Develop 13-15+ Segment:

Beginning in early 2007, the company started development of the product models that would be required for a Web 2.0 presence to serve the 13-15+ marketplace. The annual subscription memberships will be sold to this segment at a projected price of $15/year, purposely set low to be conservative until testing can validate an appropriate pricing strategy in 2008. Significant product development investments are expected for the next three years as the company's web presence is designed, rolled out and enhanced. A website producer was hired in late 2007 and further technical staff will be brought on board in 2008. The platform to be used for the site will be developed using standard marketplace middleware with the addition of specific components to meet the needs of the customers. Beta site testing of the new site is planned for 1st quarter of 2008 with roll-out in the 2nd quarter of 2008.

### Table 3: Five Year 13-15+ Segment Subscription Growth Projections

| Year End | 2007 | 2008 | 2009 | 2010 | 2011 |
|----------|------|------|------|------|------|
| Total Subscriptions | N/A | 16,200 | 75,900 | 135,000 | 194,300 |
| Renewal Rate | | 0% | 50% | 50% | 50% |

## Leveraging Existing Content – the LunaVida Club:

An additional growth initiative in the plan is the further monetization of existing content. In the development of content for the current magazine, as well as the content to be developed for the 13-15+ segment, excess content is created and not used for a variety of reasons. The concept of establishing The LunaVida Club is to provide a vehicle to monetize that additional content for

those customers who desire a deeper dive into New Moon content, interactions with others on particular content, or simply want more content. This value-add is made available through a premium price to existing customers as well as to new customers on the web. The membership price is currently projected to be $10 annually. This price is purposely set low to be conservative until testing can validate an appropriate pricing strategy. There may also be the opportunity to introduce New Moon to new customers through the club at an entry price that is lower than the print magazine price. It may also be possible to sell content to non-customers who want only limited interactions as opposed to an annual membership.

The LunaVida Club also provides the opportunity to develop licensing agreements with other parties, particularly merchandisers, in order to capitalize on the value in the New Moon brand names. New Moon plans to make some of this product available for sale on their site but the company does not plan to be in the fulfillment business.

**Table 4: Five Year The LunaVida Club Segment Growth Projections**

| Year End | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Memberships | pilot | 14,700 | 30,500 | 43,600 | 62,900 |
| Renewal Rate | | 30% | 30% | 30% | 30% |
| Merchandising License Revenues | N/A | N/A | $65,000 | $124,000 | $121,000 |
| Merchandising Revenues | N/A | N/A | $20,000 | $81,000 | $127,000 |

### Funding Plans

In order to accomplish this plan, a $1 Million investment in New Moon in exchange for equity is being raised in the winter of 2007-08. The use of these funds is as follows.

**Table 5:  Use of Funds:**

| | |
|---|---|
| Staffing | $300,000 |
| Marketing & Brand Development | $300,000 |
| Product Development | $250,000 |
| Hardware/ Software | $150,000 |
| **TOTAL** | **$1,000,000** |

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

The capitalization of the company before and after the transaction is shown in the table below.

## Table 6;  New Moon Capitalization
### (Pre and Post Transaction)

| | Phase 1 2007 | Investment 2007-08 | | 12/31/07 | 12/31/08 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|
| **Capital Stock** | | | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| **Original Equity** | | | | (5,370) | (5,370) | (5,370) | (5,370) | (5,370) |
| **Paid In Capital** | | 1,000,000 | | | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| **Retained Earnings** | | | | 48,629 | (369,435) | (1,039,053) | (1,007,897) | (149,034) |
| **Net Income** | | | | (418,064) | (669,618) | 31,156 | 858,863 | 1,786,097 |
| **Total Equity** | | | | (373,805) | (43,423) | (12,267) | 846,596 | 2,632,693 |
| | | | | | | | | |
| **Mkt Valuation** | 2,000,000 | | 3,000,000 | | *Estimated acquisition value:* | | | **10,000,000** |
| **Stockholder Shares** | | 2,000,000 | 3,000,000 | | | | | |
| I Gruver | 60% | 1,200,000 | 1,170,000 | 39.00% | | | | |
| Mavis Gruver | 20% | 400,000 | 265,000 | 8.83% | | | | |
| Antonia Kelly | 20% | 400,000 | 265,000 | 8.83% | | | | |
| **Earned Equity Pool** | | | 150,000 | 5.00% | | | | |
| Management Pool | | | 150,000 | 5.00% | | | | |
| Investors | | | 1,000,000 | 33.33% | | *Total Rate of Return over 4 years:* | | **333%** |
| **Total** | 100% | 2,000,000 | 3,000,000 | 100.00% | | | | |

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

# RISKS

The risks in this plan can by summarized as timing and product development as described in more detail below. Expanding the visibility and reputation of the "brand" as a healthy, credible source of information for girls and young women creates opportunities for all of the products envisioned in the current plan as well as creates intangible brand value for a potential acquirer. While the company is investing significant resources into the further development and enhancement of its brand image, there is no guarantee that their efforts will be successful.

The existing brand/ image of creating a voice for girls has been created in the original print publication. The growth plans revolve around broadening and deepening the understanding of the brand but the fundamental values that exist today are important to the organization and its core values. Modifications to the brand's image in the older girl's segment will reflect adjustments for age, intellect, and independence but the theme of empowering girls is defined early. Additional strategies and tactics or modifications to existing tactics must not destroy this basic brand image.

Looking more specifically at the business strategies being developed by New Moon, the following risk assessment will be organized by product offering as developed in the pro forma.

## Print Publication:

The largest opportunity for growth in this segment is to acquire greater numbers of subscriptions, both in larger chunks as well as more cost-effectively. Subscription expansion includes both improvements in the renewal of subscriptions as well as broadening the reach of the product to girls in the 8-12 age group. Since the initial decision to purchase the print publication is often made by an adult, often without the input of the girl reader, tactics that will add increase visibility and credibility in the "interested adults" segment as well as tactics that might encourage girls to ask for a subscription are important.

Historically, sales and marketing costs as a percent of sales have been lower than the industry average but subscription acquisition has been largely one-at-a-time. Significant subscription growth cannot be achieved on a one to one sales basis. Partnerships or relationships that leverage the acquisition of new subscriptions so that multiple subscriptions are generated from target customer contacts represent the greatest opportunity to mitigate risk in this segment as well as to create future value.

## orb28 On-Line Experience:

The expansion of the New Moon concept to the 13-15 year old segment using an on-line experience requires several changes to the existing New Moon approach that raise risks. While the concept of using the girls to develop content is most likely transferable, the tactics and timeliness of this process are different and, hence, new operating parameters and metrics must be developed.

First, this segment has content demands that arise both from the need for edgier, age-appropriate content but also from being online, e.g., a greater volume of content, rapidly changing content, and interactive opportunities. This has ramifications with regards to the

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

website's basic design and appeal, its ability to be changed and updated rapidly and regularly, its functionality, and its interactive capabilities.  New Moon's existing content development processes and the related organization must be modified to be responsive to these demands from the introduction of this offering.  This might require different content generation processes, faster decision making processes, additional staff to provide for real-time responsiveness, and resources to support interactivity and cross-geography content development.  Website content development, modification, and interactivity on a daily basis is significantly different than content development and approval for a bimonthly print publication.

Customer acquisition is also different than for the print publication directed at a younger audience.  Subscribers will be acquired through links from other websites, brand reputation, and other partnerships.  The user (young woman) also is more involved in the process than for the 8-12 year old segment.  Hence, marketing efforts both in terms of message and placement must be directed largely at the girls and not as much at the "interested adults", although the adult does effect the purchase decision as they usually provide the funds for the transaction. The revenue/cost relationship in this business area is a much different model than that for the print publication.  The print publication has certain fixed costs associated with content development and setting up the publication but the model becomes leveragable as sales increase because there is an incremental variable cost associated with additional subscriptions. Hence, profits can increase at an exponential rate.

The online model, however, requires significant investment up front in the development of a website that has a fairly broad range of functionality.  This cannot really be done on an incremental basis.  Content must be developed and kept continually fresh in order to attract customers.  Sales and marketing funds must be invested to drive customers to the site.  It is only after these investments that there is a chance to acquire customers and revenues. Successful acquisition of a large number of customers can generate funds to support on-going business costs but failure to acquire an adequate number can cause significant cash flow issues.


### LunaVida Club Memberships:

Using the internet structure required by the orb28 experience, excess content that has been developed for the 8-12 age segment will be repackaged and provided to customers in other forms.  It is assumed that minimal additional investment is required to repackage the products and make them available to the customer and thus that the revenues generated will provide a significant contribution to the company.

Customers for these products will be largely existing customers or new customers searching for a "healthy" resource and for information or products.  They will typically come through links from other websites or from search engines.  Hence, the risk associated with this opportunity is largely dependent on the visibility of New Moon.


### Brand Licensing and Merchandise

In year three, merchandise will be added to the offerings.  The products will be unique or specialized in a manner that differentiates them and tries to capture a relationship with the New Moon brand.  The plan is to identify credible partners that want the value from being associated with the New Moon brand and who will provide broader reach for New Moon.  These

partnerships will provide an opportunity for New Moon to monetize its brand through licensing and/ or actual product sales.  In order to attract these partners, however, the visibility and value of the New Moon brand needs to be established.

In summary, the major risks to New Moon's execution of a successful growth plan can be characterized as follows:

- Partnerships or other relationships cannot be developed to rapidly increase the print publication's distribution.
- New Moon's brand visibility and success in converting sales in the "interested adults" group is limited.
- New Moon's brand and/or online content is not accepted by the 13-15 year old segment.
- A successful Web 2.0 presence for New Moon is not achieved in a timely fashion.
- The New Moon product for 13-15 year olds does not generate enough revenue to recover the significant upfront costs associated with this offering.
- Repackaging of content and providing a broader product offering using the New Moon brand is not accepted by the market.
- A potential buyer does not identify value in the New Moon brand and/or business model.

**Attachment I**

### 1. New Moon Magazine Subscriber Zip Code Locations
### (Dot Sizes Reflect Current Subscriber Counts)



New Moon has subscribers in 6,866 (16%) of the 41,700 US Zip Code Areas

0    200    400 Miles

EXCENSUS LLC

## Attachment II: New Moon Historical Income Statements

| | Jan - Dec 04 | Jan - Dec 05 | Jan - Dec 06 |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Total Income** | 928,542.98 | 912,715.66 | 752,475.57 |
| | | | |
| **Cost of Goods Sold** | | | |
| 50000 · New Moon Cost of Goods Sold | 592,681.83 | 635,020.74 | 546,263.33 |
| **Total COGS** | 654,304.38 | 691,964.23 | 588,365.33 |
| | | | |
| **Gross Profit** | 274,238.60 | 220,751.43 | 164,110.24 |
| **Expense** | | | |
| **Total Expense** | 167,761.79 | 202,519.36 | 279,507.64 |
| | | | |
| **Net Ordinary Income** | 106,476.81 | 18,232.07 | 115,397.40 |
| | | | |
| **Other Income/Expense** | | | |
| **Other Income** | | | |
| **Total Other Income** | -2,213.86 | 7,220.48 | 29,073.44 |
| **Total Other Expense** | 117.53 | 290.19 | -276.10 |
| | | | |
| **Net Other Income** | -2,331.39 | 6,930.29 | 29,349.54 |
| **Net Income** | **104,145.42** | **25,162.36** | **-86,047.86** |

## Attachment III: New Moon Historical Balance Sheets

| | Dec 31, 04 | Dec 31, 05 | Dec 31, 06 |
|---|---|---|---|
| **ASSETS** | | | |
| **Total Current Assets** | 689,124.58 | 719,401.06 | 509,057.36 |
| **Fixed Assets** | | | |
| **Total Fixed Assets** | 7,140.09 | 2,784.09 | 14,649.76 |
| | | | |
| **TOTAL ASSETS** | 696,264.67 | 722,185.15 | 523,707.12 |
| | | | |
| **LIABILITIES & EQUITY** | | | |
| **Total Liabilities** | 522,095.17 | 522,761.29 | 477,858.28 |
| **Equity** | | | |
| **Total Equity** | 174,169.50 | 199,423.86 | 45,848.84 |
| | | | |
| **TOTAL LIABILITIES & EQUITY** | 696,264.67 | 722,185.15 | 523,707.12 |

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

## Attachment IV: New Moon 5 Year ProForma Income Statements

|  | Historical Average | 2007 Total | 2008 Total | 2009 Total | 2010 Total | 2011 Total |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| 8-12 Segment | 658,085 | 646,800 | 1,304,341 | 1,722,586 | 2,130,318 | 2,571,300 |
| 13-15 Segment | 0 | 0 | 69,000 | 722,625 | 1,607,313 | 2,780,905 |
| The Club Segment | 94,989 | 50,669 | 54,197 | 266,510 | 518,583 | 661,000 |
| Other | 119,878 | 61,537 | 56,400 | 0 | 0 | 0 |
| **Total Revenue** | 872,951 | 759,005 | 1,483,938 | 2,711,721 | 4,256,214 | 6,013,205 |
| | | | | | | |
| **COGS** | | | | | | |
| 8-12 Segment | 306,077 | 302,308 | 465,846 | 607,698 | 714,535 | 839,941 |
| 13-15 Segment | 0 | 0 | 276,917 | 339,353 | 507,929 | 871,028 |
| The Club Segment | 76,932 | 55,487 | 91,359 | 171,879 | 207,504 | 233,706 |
| Other | 51,962 | 40,924 | 42,828 | 0 | 0 | 0 |
| **Total COGS** | 434,972 | 398,718 | 876,950 | 1,118,930 | 1,429,969 | 1,944,676 |
| | | | | | | |
| **Gross Margin** | 437,979 | 360,286 | 606,988 | 1,592,791 | 2,826,245 | 4,068,529 |
| % of Sales | 50.17% | 47.47% | 40.90% | 58.74% | 66.40% | 67.66% |
| | | | | | | |
| **Sales and Marketing** | | | | | | |
| 8-12 Segment | 210,866 | 262,499 | 343,047 | 447,215 | 534,256 | 633,915 |
| 13-15 Segment | 0 | 50,125 | 138,790 | 170,542 | 378,016 | 545,521 |
| The Club Segment | 2,892 | 13,875 | 62,035 | 74,034 | 96,974 | 120,569 |
| Corporate PR | 0 | 12,000 | 12,000 | 44,053 | 45,014 | 46,005 |
| **Total Sales and Marketing** | 213,758 | 338,499 | 555,872 | 735,843 | 1,054,260 | 1,346,009 |
| % Sales | 24.49% | 44.60% | 37.46% | 27.14% | 24.77% | 22.38% |
| | | | | | | |
| **General Administration** | | | | | | |
| 8-12 Segment | 140,771 | 0 | 0 | 0 | 0 | 0 |
| 13-15 Segment | 0 | 0 | 0 | 0 | 0 | 0 |
| The Club Segment | 0 | 0 | 0 | 0 | 0 | 0 |
| Corporate Admin | 57,750 | 311,482 | 442,529 | 493,555 | 539,407 | 548,389 |
| **Total General Administrative** | 198,521 | 311,482 | 442,529 | 493,555 | 539,407 | 548,389 |
| % Sales | 22.74% | 41.04% | 29.82% | 18.20% | 12.67% | 9.12% |
| | | | | | | |
| **Total SG & A** | 412,279 | 649,981 | 998,400 | 1,229,398 | 1,593,667 | 1,894,398 |
| | | 85.64% | 67.28% | 45.34% | 37.44% | 31.50% |
| | | | | | | |
| **Product Development** | | | | | | |
| 8-12 Segment | | 0 | 8,028 | 18,870 | 21,913 | 22,424 |
| 13-15 Segment | 0 | 91,600 | 168,620 | 171,017 | 184,709 | 187,011 |
| The Club Segment | 0 | 15,000 | 75,058 | 95,010 | 102,616 | 103,895 |
| Corporate Development | 0 | 8,000 | 24,000 | 47,340 | 64,477 | 74,705 |
| **Total Product Development** | 0 | 114,600 | 275,706 | 332,237 | 373,715 | 388,034 |
| | 0.00% | 15.10% | 18.58% | 12.25% | 8.78% | 6.45% |
| | | | | | | |
| **EBITDA** | 25,700 | (404,294) | (667,118) | 31,156 | 858,863 | 1,786,097 |
| | 2.94% | | | 1.15% | 20.18% | 29.70% |
| | | | | | | |
| **Other Income** | | (1,849) | 0 | 0 | 0 | 0 |
| **Other Expense** | | 4,705 | 2,500 | 0 | 0 | 0 |
| **Net Other Income** | | (6,554) | (2,500) | 0 | 0 | 0 |
| | | | | | | |
| **EBTDA** | | (410,849) | (669,618) | 31,156 | 858,863 | 1,786,097 |

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

**Attachment V: New Moon Pro Forma Balance Sheets**

| | 2006<br>12/31/06 | 2007<br>12/31/07 | 2008<br>12/31/08 | 2009<br>12/31/09 | 2010<br>12/31/10 | 2011<br>12/31/11 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash | 400,345 | 306,954 | 786,742 | 1,351,531 | 2,758,573 | 5,644,227 |
| Accounts Receivable | | | | | | |
| A/R Daughters | 7,951 | 6,703 | 6,703 | 6,703 | 6,703 | 6,703 |
| A/R MOM | 625 | 1,018 | 1,018 | 1,018 | 1,018 | 1,018 |
| A/R New Moon | 55,215 | 38,083 | 38,358 | 38,908 | 39,183 | 40,558 |
| A/R QuickFill | 18,271 | 23,699 | 24,276 | 27,059 | 28,918 | 32,018 |
| **Total Accounts Receivable** | 82,062 | 69,503 | 70,355 | 73,688 | 75,822 | 80,297 |
| | | | | | | |
| **Inventory** | 21,865 | 16,237 | 16,237 | 25,237 | 20,937 | 32,837 |
| **PrePaid Accounts** | 2,008 | 574 | 574 | 574 | 574 | 574 |
| **Other Current Assets** | 2,777 | 2,468 | 2,468 | 2,468 | 2,468 | 2,468 |
| **TOTAL Current Assets** | 509,057 | 395,736 | 876,377 | 1,453,498 | 2,858,374 | 5,760,403 |
| | | | | | | |
| **Fixed Assets** | 134,950 | 182,377 | 209,377 | 233,377 | 302,377 | 356,377 |
| **Accumulated Depr** | (120,301) | (120,301) | (120,301) | (120,301) | (120,301) | (120,301) |
| **Total Fixed Assets** | 14,650 | 62,076 | 89,076 | 113,076 | 182,076 | 236,076 |
| Correction | | | | | | |
| **TOTAL ASSETS** | 523,707 | 457,812 | 965,453 | 1,640,261 | 3,040,450 | 5,996,479 |
| | | | | | | |
| **LIABILITIES & EQUITY** | | | | | | |
| **Accounts Payable** | 44,136 | 93,747 | 139,704 | 167,772 | 238,838 | 324,872 |
| **Other Current Liabilities** | 12,959 | 12,099 | 12,099 | 12,099 | 12,099 | 12,099 |
| **Current Borrowings** | | 150,000 | 0 | 0 | 0 | 0 |
| **Deferred Revenue  8-12** | 407,358 | 559,670 | 615,006 | 617,574 | 622,678 | 608,305 |
| **Deferred Revenues 13-15** | 0 | 0 | 174,000 | 589,875 | 1,006,813 | 1,899,157 |
| **Deferred Revenues The Club** | 0 | 16,102 | 68,067 | 191,521 | 313,427 | 519,354 |
| **Daughters Payable** | 13,405 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL Current Liabilities** | 477,858 | 831,618 | 1,008,876 | 1,578,841 | 2,193,854 | 3,363,787 |
| | | | | | | |
| **Long Term Liabilities** | | | | | | |
| **TOTAL Liabilities** | 477,858 | 831,618 | 1,008,876 | 1,578,841 | 2,193,854 | 3,363,787 |
| | | | | | | |
| **Capital stock** | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| **Shareholders Equity** | (3,780) | (5,370) | (5,370) | (5,370) | (5,370) | (5,370) |
| **Paid In Capital** | | 0 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| **Retained Earnings** | 134,677 | 48,629 | (369,435) | (1,039,053) | (1,007,897) | (149,035) |
| **Net Income** | (86,048) | (418,064) | (669,618) | 31,156 | 858,863 | 1,786,097 |
| **Total Equity** | 45,849 | (373,805) | (43,423) | (12,267) | 846,595 | 2,632,692 |
| | | | | | | |
| **TOTAL LIABILITIES &<br>EQUITY** | 523,707 | 457,812 | 965,453 | 1,566,574 | 3,040,450 | 5,996,479 |

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC

## Attachment VI: New Moon Pro forma Cash Flow Statement

| | 2007 6 Mo Tot (Jul-Dec) | 2008 Total | 2009 Total | 2010 Total | 2011 Total |
|---|---|---|---|---|---|
| **CASH RECEIVED** | | | | | |
| **Cash From Operations** | | | | | |
| 8-12 Segment Cash Receipts | 498,272 | 1,132,227 | 1,472,901 | 1,831,100 | 2,202,377 |
| 13-15 Segment Cash Receipts | 0 | 243,000 | 1,138,500 | 2,024,250 | 3,673,250 |
| The Club Segment Cash Receipts | 20,125 | 106,162 | 304,965 | 435,489 | 618,927 |
| Other Segment Income | 29,100 | 56,400 | 0 | 0 | 0 |
| Cash Sales 8-12 Segment  (List/Reprint/Single Copy) | 6,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Cash Sales The Club  (Merchandise) | 24,000 | 0 | 20,000 | 81,000 | 127,000 |
| Cash License/ Royalties The Club | 0 | 0 | 65,000 | 124,000 | 121,000 |
| **Subtotal Cash From Operations** | 577,497 | 1,549,789 | 3,013,366 | 4,507,839 | 6,754,554 |
| | | | | | |
| **Additional Cash Received** | | | | | |
| Accounts Receivable Paid | 76,003 | 214,598 | 236,920 | 290,188 | 338,074 |
| Other Current Assets | 0 | 0 | 0 | 0 | 0 |
| New Current Borrowings | 150,000 | 0 | 0 | 0 | 0 |
| New Long Term Liabilities | 0 | 0 | 0 | 0 | 0 |
| Sales of Assets | 0 | 0 | 0 | 0 | 0 |
| New Investment Received | 0 | 1,000,000 | 0 | 0 | 0 |
| **Subtotal Additional Cash Received** | 226,003 | 1,214,598 | 236,920 | 290,188 | 338,074 |
| | | | | | |
| **TOTAL CASH RECEIVED** | 803,499 | 2,764,387 | 3,250,286 | 4,798,028 | 7,092,628 |
| | | | | | |
| **EXPENDITURES** | | | | | |
| **Expenditures from Operations** | | | | | |
| Cash Spending | 299,612 | 846,245 | 1,116,281 | 1,259,479 | 1,316,622 |
| Inventory | 0 | 0 | 15,000 | 20,000 | 50,000 |
| Accounts Payable | 439,504 | 1,261,354 | 1,530,216 | 2,042,507 | 2,786,352 |
| **Subtotal Spent on Operations** | 739,116 | 2,107,599 | 2,661,497 | 3,321,986 | 4,152,974 |
| | | | | | |
| **Additional Cash Spent** | | | | | |
| Principal Payment of Current Borrowings | 0 | 150,000 | 0 | 0 | 0 |
| Other Current Liabilities | 0 | 0 | 0 | 0 | 0 |
| Long Term Liabilities Principal Payment | 0 | 0 | 0 | 0 | 0 |
| Asset Purchases | 46,000 | 27,000 | 24,000 | 69,000 | 54,000 |
| **Subtotal Additional Cash Spent** | 46,000 | 177,000 | 24,000 | 69,000 | 54,000 |
| | | | | | |
| **TOTAL CASH SPENT** | 785,116 | 2,284,599 | 2,685,497 | 3,390,986 | 4,206,974 |
| | | | | | |
| **Net Cash Flow** | 18,383 | 479,788 | 564,789 | 1,407,042 | 2,885,654 |
| | | | | | |
| **Beginning Cash Balance** | 288,571 | 306,954 | 786,742 | 1,351,531 | 2,758,573 |
| **Ending Cash Balance** | 306,954 | 786,742 | 1,351,531 | 2,758,573 | 5,644,227 |

© 2006-07 Proprietary and Confidential, New Moon Girl Media, LLC